**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **CRIMINAL NO. BAH-26-309** |
| **DARRYL HAIRSTON, JR.,** | * | |
| **Defendant.** | * | |

*******

**GOVERNMENT'S DETENTION MEMORANDUM**

The United States of America, by and through its undersigned attorneys, submits this Detention Memorandum in advance of Defendant Darryl Hairston, Jr.'s detention hearing, scheduled for September 24, 2026, at 11:30 a.m.

**Introduction**

The Court should order detention. The Defendant is charged in connection with a serious drug trafficking conspiracy involving bulk quantities of fentanyl and cocaine base ("crack" cocaine), firearms, and violence. The Defendant's specific role in the conspiracy was significant: He directly assisted his long-time associate and former gang leader Charles Byers with obtaining and processing large quantities of drugs, and the Defendant directly oversaw the operations of an open-air drug market—"street shop"—where those drugs were sold. Notably, the Defendant used minors to sell his product for him, and on multiple occasions, the Defendant sold more significant amounts of narcotics to an undercover agent. Given the seriousness of the offense, the Defendant's criminal history and personal conduct during this investigation, his prior violations of state-level probation, and the danger posed by Defendant to the community, it is apparent that no condition

or combination of conditions will reasonably assure the Defendant's appearance or the safety of the community.

**Factual and Procedural Background**

*The Pattern of Drug Processing and Distribution*

The Defendant worked hand-in-hand with codefendant Charles Byers to operate a large-scale drug trafficking organization ("DTO") in Baltimore Maryland. From May 2026 through the day he was arrested, investigators observed a consistent pattern of activity from the Defendant and Byers: Byers would purchase large quantities of cutting agents, such as quinine and mannitol, and drug packaging materials from a store in Baltimore County, which agents came to understand usually indicated that the DTO had just received a bulk supply of narcotics. Byers then took the supplies and drugs obtained from other locations to a stash house for processing. Specific to the indictment, the most relevant stash house was located at 1330 Woodbourne Avenue, Baltimore, Maryland (the "Woodbourne Premises"). Byers and the Defendant used the Woodbourne Premises to process "raw" fentanyl for distribution by mixing it with cutting agents and putting it into gel caps. Byers or the Defendant then transported the processed drugs to a different location.




*(Left) Byers loading a bag of suspected cutting agents and/or packaging material into his car on June 7, 2026. (Right) Byers taking that bag and a second weighted-down bag of suspected narcotics into the Woodbourne Premises less than an hour later.*



*(Left) The Defendant entering the Woodbourne Premises on June 7, 2026, less than ten minutes after Byers had gone in. (Right) The Defendant leaving the Woodbourne Premises with a weighted-down blue bag just under half an hour later.*

In the Defendant's case, drugs prepared at the Woodbourne Premises were often transported to a street shop he oversaw in the 2100 block of Druid Hill Avenue (the "Druid Hill Street Shop"). Investigators saw the Druid Hill Street Shop operating over several months in a consistent manner. In general, the Defendant would bring drugs from a stash location to the area of the street shop and either put them in a secondary indoor stash location or at an outdoor "ground stash" for his subordinates to use. Those subordinates were teenagers.

Throughout the course of the investigation, agents saw hand-to-hand transactions conducted at the Druid Hill Street Shop by boys who appeared to be adolescents. Early on, in May 2026, one of the boys was arrested by Baltimore Police Department ("BPD") officers and confirmed to be a juvenile. The Defendant, who had been interacting with that boy and others throughout the day, watched on as the arrest took place. The juvenile was arrested with vials of cocaine base and gel capsules of suspected fentanyl. That same boy was again arrested in the same block in August 2026, again in possession of vials of suspected cocaine base and gel capsules of suspected fentanyl. During surveillance, agents also saw boys working for the Defendant and Byers get into a dispute with what appeared to be a rival group. The Defendant watched as the

fight was "broken up" by Byers, who physically attacked one of the rival group and displayed a gun in his waistband.

The Defendant appears to have personally stepped in to handle transactions involving larger quantities of drugs. Shortly after identifying the Druid Hill Street Shop, an undercover agent began conducting controlled purchases of distribution quantities of fentanyl and cocaine directly from the Defendant, who appeared to retrieve the drugs for sale from the same stash locations that investigators had seen him go into with suspected drugs obtained from the Woodbourne Premises.

*July 24, 2026, Search of the Woodbourne Premises*

On July 24, 2026, investigators obtained a state search warrant for the Woodbourne Premises. That morning, investigators had seen Byers moving suspected drugs from a different stash location to the Woodbourne Premises. The Defendant arrived almost immediately after Byers and carried a bag out of the Woodbourne Premises shortly after entering. The Defendant returned to the Woodbourne Premises later in the day, and over an hour later, the Defendant and Byers both left. The Defendant was carrying a bag of suspected drugs at the time.

Within half an hour of Byers and the Defendant leaving, investigators executed the search warrant and confirmed their suspicions about how the Woodbourne Premises had been used. Investigators found significant quantities of fentanyl (both in "raw" and "processed" form), cocaine base, cutting agents, packaging materials, and loaded firearms.[1] The Drug Enforcement Administration's Mid-Atlantic Laboratory is continuing its analysis of the drugs found at the Woodbourne Premises, but to date, tests have confirmed that the seized narcotics included over 1.6 kilograms of fentanyl (not including approximately 10,000 filled gel capsules that are pending

[1] During the search, another man was present at the Woodbourne Premises and claimed ownership of the drugs and firearms. But when questioned by investigators, that individual could not identify the drugs that were present in the home or provide any details about the firearms.

results), over one kilogram of powder cocaine, and over 300 grams of cocaine base. The firearms found at the Woodbourne Premises—a .410 gauge/.45 caliber revolver, a .44 Magnum revolver, and a Mini Draco 7.62x39 mm pistol—were loaded. Two of the three firearms had been reported as stolen.




*(Left) Approximately 10,000 gelatin capsules filled with suspected fentanyl. (Middle) A bag containing approximately 1,615.4 grams of fentanyl. (Right) A box containing powder cocaine, cocaine base, and fentanyl.*



*The loaded firearms seized from the Woodbourne Premises.*

While the search was being executed, Byers was coincidentally stopped for a traffic violation while driving a rental vehicle. He fled from that stop. Location data from the Defendant's phone and car and Byers' phone showed the following: The Defendant came to Byers' location shortly after he eluded police. The Defendant then appears to have driven Byers

back to an apartment he frequently stayed in, and later that evening, drove Byers back to where his rental car had been abandoned. The Defendant traveled with Byers to the area of the Alamo rental car lot at BWI, where Byers returned the rental car, and the Defendant then drove Byers back to Baltimore.

*Additional Stash Location Searches*

After the search of the Woodbourne Premises, the Defendant and Byers continued their same pattern of activity, but they began using different stash locations, switching up phones, and taking other steps to avoid detection by law enforcement. In August 2026, BPD officers executed search warrants at two of those locations, both of which were frequented by the Defendant, for reasons unrelated to the federal investigation. At both locations, officers found distribution quantities of suspected drugs. At one location, officers also found another firearm, which had been reported stolen in Virginia. Notably, the Defendant was seen both before and after the August 19, 2026, execution of the search warrant at a stash location on Park Avenue. He even attempted to enter the apartment and, when stopped by officers, asked if there were rooms available to rent.



*Suspected narcotics and drug processing materials found during the August 19, 2026, execution of a state search warrant at an identified stash location for the DTO on Park Avenue. Officers executing the search warrant were unaware of the federal investigation; they had been alerted to the presence of suspected drugs in the residence by a maintenance crew working in the building.*

After those searches, Byers and the Defendant appeared to become even more vigilant in their activity, leading up to the search of several of the locations investigators had identified as being used by the DTO for their activities.

*September 22, 2026, Federal Arrest and Search Warrant Executions*

On September 10, 2026, a grand jury sitting in the District of Maryland returned an Indictment charging the Defendant with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) and (b)(1)(C) (Count One); Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (Count Two); Possession of Firearms and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (Count Three); and Possession of Firearms in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). ECF 1.

On September 22, 2026, agents executed federal arrest warrants for the Defendant and Byers and search warrants at multiple locations and vehicles used by Byers, the Defendant, and other members of the DTO. Investigators recovered thousands more gel capsules of suspected fentanyl, multiple kilograms of powdered suspected fentanyl, and additional firearms. Significant amounts of suspected fentanyl—in both gel capsules and powdered form—were found at stash locations the Defendant had been frequenting on a regular basis. At one stash location used by the DTO, bags of suspected fentanyl were marked "East Side" and "West Side."




*Suspected drugs, cash, firearms, drug packaging materials, and a kilogram press (found in the Defendant's car) seized by investigators during the September 22, 2026, execution of federal search warrants.*

When warrants were executed at the residences being used by Byers and the Defendant that morning, both defendants' immediate reaction was to begin smashing all the cell phones in their possession. Investigators using a drone to make secure entry to the Defendant's residence saw him run into the bathroom and throw the phone hard on the floor before he shut the door.

On September 22, 2026, the Defendant had his initial appearance on the Indictment. The government is seeking detention.

**<u>Argument</u>**

When there is probable cause to believe that a defendant committed an offense under the Controlled Substances Act that carries a maximum sentence of 10 years or more of imprisonment, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). That presumption shifts the burden to the defendant to proffer "at least some evidence or basis to conclude that the case falls outside the congressional paradigm giving rise to the presumption."

*United States v. Green*, Crim. No. DKC-26-093, 2026 WL 1242893, *3 (D. Md. May 6, 2026) (quoting *United States v. Lee*, Crim No. ELH-19-159, 2020 WL 1974881, *4 (D. Md. April 24, 2020)) (internal quotations omitted). However, the presumption in favor of detention is not eliminated once the defendant meets the burden of production; it becomes a factor to be considered in evaluating whether to detain the defendant. *Id.*

When seeking detention, the government's burden is to demonstrate flight risk by a preponderance of the evidence or the danger posed by the defendant by clear and convincing evidence. *United States v. Vane*, 117 F.4th 244, 251 (4th Cir. 2024); 18 U.S.C. § 3142(f)(2). When seeking a detention order, the government may proceed by proffer of information. *See Vane*, 117 F.4th at 250–51 ("[T]he judicial officer should consider a broad swath of available information, unrestricted by "[t]he rules concerning admissibility of evidence in criminal trials.'" (quoting 18 U.S.C. § 3142(f))). In determining whether detention is warranted, 18 U.S.C. § 3142(g) directs the Court to consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to the community that would be posed by the defendant's release.

Here, each of the Section 3142(g) factors weigh in favor of detention. There is no condition or combination of conditions can assure the Defendant's appearance or the safety of the community.

<u>Nature and Circumstances of the Offense</u>

The Defendant is charged with serious drug offenses that carry significant penalties, including counts that carry mandatory minimum sentences of ten years' imprisonment up to maximum sentences of life imprisonment. He is further charged with possessing multiple firearms

in furtherance of his drug trafficking activities. *See, e.g.*, *United States v. Ratchford*, Crim. No. SAG-20-701, 2020 WL 3792209, *4 (D. Md. July 7, 2020) ("[The defendant] contends that he is charged merely with possessing a gun, rather than with using or even brandishing the weapon. However, illegal gun possession is itself a serious offense, particularly in a city where gun violence, unfortunately, has become quotidian.") (citing *United States v. West*, Crim. No. ELH-19-364, 2020 WL 1820095, *3 (D. Md. Apr. 10, 2020) ("Defendant is charged with illegal possession of a firearm under 18 U.S.C. § 922(g)(1). This is a serious offense. As the government acknowledges, the defendant does not have a history of violence. But, a firearm is itself 'a tool' of violence. This is a truism that Baltimore knows all too well.") (citations omitted)).

The specific conduct underlying the offenses heightens their seriousness. Over the course of the conspiracy, the Defendant was constantly procuring, processing, and selling drugs. The seized quantities of fentanyl, cocaine, and cocaine base from one stash location on one day alone are significant; when viewed alongside the DTO's daily activity, the actual amount of drugs the DTO—and the Defendant personally—pushed to Baltimore's streets is staggering. The Druid Hill Street Shop that the Defendant oversaw sold fentanyl and cocaine base on a daily basis, and the bags of drugs found on September 22, 2026, marked as "East Side" and "West Side" clearly show that the DTO's operations were not limited to only that location. That is also consistent with investigator's observations and location data showing both Byers and the Defendant routinely traveling to locations around Baltimore and outside the city in connection with their drug trafficking activities.

And as is commonly the case, Byers and the Defendant kept guns as part and parcel of their activities. The three loaded guns found at the Woodbourne Premises were in arms reach of

whoever happened to be in there processing drugs at the time. Violence was baked into the DTO's operations.

Beyond those circumstances, the Defendant's use of juvenile "corner boys" to sell his drugs bears special mention. This practice is not unique to the Defendant, having even been depicted in popular television shows, such as "The Wire." But that does not make it any less repugnant. The Defendant used kids to do user-level distribution for the same reasons that other dealers have historically done so: He understood that juveniles are less likely to spend significant time detained on drug charges, meaning that his "employees" could get back to work faster. The fact that those children will surely be appearing in court on adult charges in the coming years meant nothing to the Defendant or Byers. They got what they needed.

The nature of the offenses is serious enough that it creates a presumption in favor of detention. 18 U.S.C. § 3142(e)(3)(A). Even if the Defendant can meet his burden to produce any evidence suggesting he may not be a danger to the community, that presumption remains a factor. Overall, the seriousness of the charged offenses weighs in favor of detention.

Weight of the Evidence

The government's evidence is ironclad. The Defendant's drug trafficking conduct is clearly documented through months of physical surveillance, pole cameras, location tracking, controlled buys, and numerous drug and gun seizures. The investigation showed that the Defendant worked in the drug trade all day, every day.

History and Characteristics of the Defendant

The Defendant's criminal history is directly intertwined with his personal and criminal association with his codefendant, Charles Byers. In 2001, both men were charged in a multi-defendant indictment for their roles in the "Project Boys" DTO/gang, which had been engaged in

a bloody conflict with the rival "North Avenue Boys" gang in Baltimore. *United States v. Coleman et al.*, Crim. No. GLR-01-304.[2] The Project Boys sold mass quantities of heroin, cocaine, and cocaine base in Baltimore. Byers, in his role as a leader of the gang, ordered and personally carried out several murders in furtherance of their activities, including a shooting at a park on Memorial Day 2001, which wounded 11 and killed one. *See id.*, ECF 768 at 6–12. (Government's Response to Motion for Sentence Reduction). The Defendant pled guilty to Conspiracy to Possess Firearms in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(o) and was sentenced to 20 years' imprisonment. *Id.* ECF 418. He served almost the entire 20-year term, and upon release, he appears to have gotten right back to what he had been doing two decades earlier.

The Defendant's previous criminal history may appear aged, but that is simply by virtue of him having spent so long in federal custody. His prior offenses showed that his conduct was escalating over a short period of time and included multiple violations of probation. The Defendant was routinely arrested on new criminal charges while on pretrial release in pending cases. His conduct in the instant case shows that age has not slowed him down. The Defendant has been Byers' right-hand man throughout this investigation, not only playing a key role in the drug distribution scheme but directly aiding Byers in evading police after his July 24, 2026, traffic stop. The Defendant's first reaction upon finding that his residence was being searched was not to surrender, and it was not even to flee. His first instinct was to immediately begin destroying evidence. The Defendant's years in federal prison apparently had no deterrent effect; he remains a serious flight risk and an immense danger to his community.

The Defendant's personal history and characteristics demonstrate the grave danger he poses to the community, whether that be the customers buying his deadly drugs, anyone who

[2] The case was initially before the Honorable J. Frederick Motz. Chief Judge Russell inherited the matter for post-conviction proceedings.

comes into his DTO's stash houses while he is near a firearm, or the teenage boys he used to run his open-air drug market. He has further shown his propensity for flight and to help others flee from prosecution. Even if the Court were to attempt to fashion conditions of release, the Defendant has multiple prior violations of probation. The Court cannot trust that he will abide by any conditions or combination of conditions of pretrial release that could be set in this matter. The Defendant's history paints a clear picture of his ongoing criminal conduct and refusal to comply with court orders. Accordingly, this factor weighs strongly in favor of detention. *See West*, 2020 WL 1820095 at *4 (noting that the defendant "demonstrated a poor track record with community supervision, having violated the terms of his State probation on several occasions" and finding that the defendant's "past conduct [did] not favor release.").

<u>Nature and Seriousness of the Danger to Any Person or the Community</u>

The drugs dispensed by the Defendant are deadly. The risks associated with fentanyl and crack cocaine are well known to this Court. Even in small doses, fentanyl can be deadly, and the Defendant oversaw the procurement, processing, and distribution of kilograms of fentanyl and cocaine base. *See* Center for Disease Control, *Fentanyl Facts*, CDC (Apr. 2, 2024), https://www.cdc.gov/stop-overdose/caring/fentanyl-facts.html. Just looking at the processed drugs found in this case, investigators have seized thousands of gel capsules—each one containing a potentially lethal dose—from stash locations and controlled purchases.

In addition to the danger posed by the drugs the Defendant sold, the Defendant kept firearms at one of the DTO's primary stash locations, each one loaded and ready to be used. And the Defendant exploited juveniles to push his product on the streets, exposing them to arrest and prosecution and setting them up on a path well-trodden path that this Court knows is likely to lead to further adult criminal conduct.

There is no doubt that the Defendant's actions caused significant damage to the Baltimore community. The Defendant bears the burden of production to show he is not a danger to the community, and he cannot. He was a high-level actor in a significant DTO that he has been associated with for decades. There is no evidence that can suggest he is anything other than a serious danger to his community. This factor weighs in favor of detention. *See, e.g.*, *United States v. Ratchford*, Crim. No. SAG-20-701, 2020 WL 3792209, *4 (D. Md. July 7, 2020) ("The danger that [the defendant] poses to the community is more pronounced because of his extensive criminal record involving drugs and guns, and his history of noncompliance with court directives.").

In short, evaluation of all the Section 3142(g) factors shows that the Defendant should be detained pending trial.

**Conclusion**

For the reasons stated above, and for any others presented at the detention hearing, there is no condition or combination of conditions that would reasonably assure the Defendant's appearance for court proceedings or the safety of the community, and the Defendant should be detained pending trial.

Respectfully Submitted,

Kelly O. Hayes
United States Attorney

/s/____________________________
Alexander Levin
Tyler Pittinger
Assistant United States Attorneys